2023 IL App (1st) 220955

Second Division
December 19, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2001 CR 17936-02 |
| RICKY DIGGS, | ) ) | Honorable |
| Defendant-Appellee. | ) ) | Carol M. Howard Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a 2003 jury trial, defendant-appellee, Ricky Diggs, was convicted of the first degree murder of Tommy Calvin and sentenced to 40 years in prison. Defendant appealed his conviction, which was affirmed by our court in *People v. Diggs*, No. 1-03-1921 (2004) (unpublished order under Illinois Supreme Court Rule 23). On May 15, 2014, defendant filed an initial petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)), which alleged actual innocence. Following the denial of the State's

motion to dismiss, defendant's petition was advanced to a third-stage hearing. On April 30, 2019, the postconviction court granted the petition, vacated defendant's conviction, and ordered a new trial.

¶ 2 Thereafter, the State filed a motion *in limine* to admit the prior testimony of a now-deceased witness from defendant's original trial pursuant to Illinois Rule of Evidence 804(b)(1) (eff. Jan. 1, 2011), section 115-10.4 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/115-10.4 (West 2018)), and the confrontation clause of the sixth amendment (U.S. Const., amend. VI). The postconviction court denied the motion, and subsequent to denial of the State's motion to reconsider, the State filed a certificate of impairment pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017). The State now appeals the denial of its motion *in limine*, arguing that the postconviction court abused its discretion in barring admission of the witness's testimony at the new trial. For the reasons that follow, we affirm the judgment of the postconviction court.

¶ 3 I. BACKGROUND

¶ 4 We derive our factual background from the underlying trial record, direct appeal, and postconviction proceedings.

¶ 5 A. The Underlying Facts and Original Trial Proceedings

¶ 6 On June 3, 2001, Tommy Calvin was shot and killed near the end of an alley in the Humboldt Park neighborhood of Chicago, Illinois. Calvin had been known in the neighborhood as a drug dealer. Defendant was arrested weeks after the shooting and initially charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2000)), which were amended to five counts prior to trial. Weeks later, defendant and codefendant, Corey Flowers, were charged with Calvin's

murder. Flowers later pled guilty to conspiracy to commit first degree murder (*id.* § 8-2) pursuant to a negotiated plea agreement with the State.[1]

¶ 7                                                    1. State's Case in Chief[2]

¶ 8                                                    a. *Larry Helm*

¶ 9       Larry Helm testified that he had lived at 4207 Division Street for seven years, which was a building located near the shooting. His job was management of two properties at 4206 and 4207 Crystal Street. During his time in the neighborhood, he had become friends with Calvin and had known him for about eight or nine years prior to the shooting. Helm testified that Calvin visited him at work at 4206 Crystal Street sometime between noon and 1 p.m. on June 3, 2001. Calvin helped Helm move some trash out of the building's yard until about 1 or 2 p.m. Helm described Calvin's demeanor as "happy" and stated that he was walking around. He estimated that Calvin left the area between 1:30 and 2 p.m., and Helm stayed behind to finish work.

¶ 10      Sometime between 3 and 3:15 p.m., Helm was still working in the front yard of the same building when he heard gunshots. Helm could not tell where the gunshots were coming from. He put down his equipment, moved through a gangway, opened a gate, and went out into an alley between Crystal Street and Division Street. There, Helm saw a crowd gathering and heard someone say, "Tommy's been shot." Helm observed police officers in marked squad cars on the scene. He did not speak to police there, but later spoke to investigators that same day.

---

[1]Prior to trial, and over the State's objection, the trial court granted defendant's motion to sever his trial from that of Flowers.

[2]Because the issue on appeal is narrow, we recite only the testimony of the State's witnesses that relate to direct eyewitness testimony of the shooting. The record reflects that defendant's original attorney cross-examined every witness, including the ones not specifically mentioned in this opinion.

¶ 11    On cross-examination, Helm testified that he did not see the shooting and had only heard gunshots. He knew that Calvin did not have a steady job and "assumed" that he sold drugs.

¶ 12                                    b. *Corey Flowers*

¶ 13    Pursuant to his plea agreement, Flowers testified that he knew Calvin because Calvin sold drugs for him and further identified the defendant in court as the man who shot Calvin. According to Flowers, defendant also operated a "drug spot" in the 1200 block of North Keeler Avenue. On June 3, 2001, Flowers gave Calvin some drugs to sell, and when Flowers visited Calvin again later that day to collect the proceeds, Calvin would not turn over any money or unsold drugs. Flowers observed that Calvin was high, and the two began to argue. Defendant was also present during this argument, which lasted about five minutes.

¶ 14    Following the argument, Flowers and defendant went to Flowers's house to retrieve a gun that defendant had stored there under a mattress. The two then returned to the alley spot to confront Calvin. Defendant and Calvin were joined by Earl Smith, who also sometimes sold drugs for Flowers. When asked if he knew Smith's nickname, Flowers responded that he was unable to think of it.

¶ 15    Flowers testified that he, defendant, and Smith planned to beat up Calvin for failing to sell drugs. Upon their return, Flowers did not notice anyone in the area besides Calvin. When he saw Calvin, they began to argue again. Smith hit Calvin, and Flowers also swung at him but did not hit him. Defendant was positioned somewhere between the alley and the street. After Smith hit Calvin, Calvin started running out of the alley towards Keeler Avenue. As he ran, defendant shot Calvin in the back. Flowers remained in his position on Keeler Avenue while defendant continued to shoot at Calvin about 9 or 10 times. After defendant stopped shooting, Flowers did not know where

defendant went. Flowers traveled southbound out of the alley towards Division Street and then went to his cousin's father's home. Flowers was arrested a week later on June 10, 2001.

¶ 16    On cross-examination, Flowers testified that he belonged to the Four Corner Hustlers gang and ran his drug operation at Keeler Avenue and Crystal Street. He denied that defendant worked for him. Flowers had known Calvin for about three months, and Calvin gave him a commission on whatever drugs he sold. He did not recall the last time he had given Calvin drugs to sell but believed it to be the day he was shot or a few days prior. Flowers had given Calvin two packs of twenty-four bags of cocaine to sell, with defendant present during the exchange.

¶ 17    Flowers did not remember what was said between him and Calvin during their first argument. When asked why he and defendant went to retrieve a gun, he responded that he did not know, but later stated that they went to get the gun because Calvin had not sold any drugs and he was "fitting to get beat up." Flowers denied that it was his idea to get the gun and that it was "somewhat" defendant's idea. Flowers further testified that Smith threw two punches at Calvin, and not one, as he had stated on direct examination. Defendant did not follow Calvin when he began to run away.

¶ 18                                  c. *Keyth Ann Essie*

¶ 19    Keyth Ann Essie testified that she had lived on North Keeler Avenue on the day of the shooting and four years prior. She had known Calvin for about two years through other friends from the neighborhood. At about 3:20 p.m. on the day of the shooting, Essie came out on Keeler Avenue to drink beer with "Blue" (also known as Larry Helm), Sylvia Duncan, and Calvin. When she arrived, she observed that the beer was hot, and she went to a local store to buy more. Upon her return, she noticed Calvin walking back and forth and saying something like, "they being

together." No one other than the individuals she had mentioned prior were in the area when she returned.

¶ 20    Essie testified that Corey Flowers soon approached Calvin, who was alone at the time. Essie knew Flowers because she was neighbors with his uncle. She knew that Flowers had a speech impediment and that he stuttered when he spoke. She watched Flowers and Calvin get "up in each other's face" and exchange words. Essie overheard Flowers say to Calvin "I thought we were cooler than that," to which Calvin replied, "I thought we was too, man."

¶ 21    Thereafter, Essie observed Smith, who she also knew as "Buddha," approach Calvin and Flowers on a bike in the alley while Flowers was walking in front of Calvin. Smith laid the bike down, stood up on a piece of concrete, and then hit Calvin on his head. During this interaction, Essie stood about 25 to 30 feet away in the yard. Calvin did not hit Smith back, and then Flowers began walking away. Calvin also began walking backwards out of the alley towards Keeler Avenue. When Calvin reached the end of the alley, he started saying, "I'm still standing." Calvin continued to back up and move towards Crystal Street. Essie remained in the yard and observed Calvin turn and run away after it "looked like he saw someone he knew." After he turned, he was shot and fell to the ground.

¶ 22    Essie testified that defendant was the shooter and identified him as the same individual in court. Essie stated that defendant continued to shoot and point the gun at Calvin. She did not know how many shots were fired but believed the gun jammed at some point. After the shooting, Essie observed defendant standing over Calvin, but was unsure of his distance to Calvin in comparison to where he had stood when firing the first shot. She further observed Flowers moving towards the end of the alley towards Division Street, which was in the opposite direction of where Calvin had fallen. After Calvin was shot, Essie started screaming, "[P]lease don't kill him." Sylvia Duncan

attempted to calm her down and also started screaming for defendant not to kill Calvin. Defendant continued to shoot, despite their pleas, and Calvin remained on the ground.

¶ 23    After the shooting, Essie's cousin soon approached her to determine what was going on, to which Essie stated, "I just saw a friend of mine get shot." The police arrived at the scene, but she did not stay and talk to them. Essie's daughter and daughter-in-law also approached her and escorted her from the scene. When asked why she did not speak to police, Essie responded that she "wasn't thinking."

¶ 24    Essie eventually spoke to police on June 26, 2001, when officers came to her residence and took her to Area 5 headquarters. On June 27, 2001, she returned to the station and viewed a lineup, where she identified defendant. She denied that detectives told her who to pick in the lineup. Essie stated that the individual she picked in the lineup was the same person she had previously identified in court. When shown a photograph of the lineup she viewed, Essie again identified defendant in the photo.

¶ 25    Essie testified that she had been convicted of possession of a controlled substance in January 2001, for which she received probation. Thereafter, she voluntarily enrolled in a drug rehabilitation program in 2002. She denied being under the influence of drugs or alcohol on the day of the shooting or on the days she spoke to police, viewed a lineup, and testified before the grand jury. She did not receive any benefit regarding her probation in exchange for speaking to police.

¶ 26    On cross-examination, Essie testified that, at the time of her drug conviction, she had been using cocaine for about three years. When asked if she had been under the influence on the day of the shooting, Essie responded that she had only consumed beer with the others and denied drinking or using drugs prior to meeting up with Duncan, Helm, and Calvin. Essie admitted to using drugs

"on and off" in 2001. Essie admitted to buying cocaine from Calvin in the past but denied buying or receiving any free drugs from him in 2001. Essie believed that Flowers worked for Calvin. Over the State's objection, defense counsel asked, "You live right here[;] you know what goes on in the neighborhood?" Essie responded that she did not "know everything that goes on."

¶ 27    Essie testified that she was unaware of how much time Duncan, Helm, and Calvin had spent drinking prior to her arrival. When she went to buy beer, she bought it from a store called Pete and Jack's Liquor, located at Division Street and Keeler Avenue. Over the State's objection, she further testified that she did not remember seeing any police while in the liquor store but knew that they were usually around. When she returned, Calvin was still standing in the same position at the back of the yard. Duncan and Helm also remained, with Helm working in the yard next to them.

¶ 28    When Flowers approached Calvin the second time, defendant was not with him. Essie did not know from where defendant had come during the encounter, but she knew that the gunshots had come from where he was standing. Essie was also unaware of Smith's location immediately before and after the gunshots, as her focus had been on Calvin leaving the alley at that time. She observed Flowers leaving the alley after the gunshots, but defendant was not with him.

¶ 29    When asked if she had any relationship with the defendant, Essie responded that she had never personally met defendant and only knew him as "Little Rick" prior to her conversations with the police. Essie did not know if defendant lived in the neighborhood but had occasionally "seen him around" with Flowers. She denied being shown pictures of defendant by the police prior to the lineup but admitted to having been shown photos of Flowers. Defense counsel asked Essie, "[W]ho told you to say that [defendant] fired the gun?" She responded, "Nobody told me." Essie admitted to viewing photographs of the defendant in the hallway prior to her testimony but had

otherwise not seen the defendant in person since the shooting. She also had not known Smith for long and did not know if he lived in the neighborhood, but knew he was a "juvenile" and friends with one of her daughters. Essie admitted to being shown pictures of Smith by police and stated that he was not a tall individual.

¶ 30    On redirect examination, Essie reiterated that she had not been using drugs on the day of the shooting. Essie further testified that four people were in the lineup in which she identified defendant. On recross examination, Essie testified that she had not recognized any other individuals in the lineup or in the photograph of the lineup shown to her in court.

¶ 31                                                  d. *Sylvia Duncan*

¶ 32    Sylvia Duncan testified that she had previously lived at 4216 North Keeler and had been at that address in June 2001. She stated that the area between Division Street and Keeler Avenue had gangways, where she would often sit out at and talk to other neighbors in the area. On the morning of June 3, 2001, she was sitting in that same area in an alley that ran into Keeler Avenue between Division Street and Crystal Street. She was with Keyth Ann Essie, who she called "Ann," and Helm, both of whom she had known for about a year. The three of them stood and drank beer for about an hour, after which she went back into the house.

¶ 33    Duncan returned to the area around 2 or 2:30 p.m., and Essie and Helm were both still there. Calvin was also in the alley at about 3 p.m. She had known Calvin for about one or two years. He was a friend who used to come out to the area with them. Flowers and another "younger boy" she knew as "Ricky" were also in the same area. Duncan had previously seen him two or three times that month with Flowers, with the day of the shooting being the first time she had seen him that day. Duncan identified defendant as Ricky in court.

¶ 34     Duncan testified that Flowers approached Calvin while she and Calvin were talking. The two exchanged words, but she could not hear their conversation. Then, "another man," whom she later identified as Smith from a photograph shown to her on the stand, approached the area. Smith walked up and hit Calvin on the head. Duncan stated that, at the time Calvin was struck, she had been standing right by him, with Flowers standing near Smith. Calvin staggered a bit but did not fall. Smith attempted to hit Calvin again, but Calvin evaded it by moving backwards. Flowers then attempted to strike Calvin, but Flowers missed, slid, and fell back on the ground.

¶ 35     Calvin began to run out of the alley towards Keeler Avenue and Crystal Street, saying "I'm still standing," while Flowers ran towards Division Street. As Calvin ran, defendant walked towards him and began shooting. Although Calvin fell after the second shot, defendant continued to walk closer to him and shoot. Duncan heard a "break" in between gunshots, to which she attributed to the gun jamming. She then heard gunshots again, and observed defendant standing two feet away from Calvin, shooting at him while he lay on the ground. Duncan told defendant to stop shooting and yelled "that was enough" in a loud voice. At some point, defendant stopped shooting, but she did not know how many shots had been fired by that time.

¶ 36     After the shooting, Duncan observed defendant leaving in a car traveling towards Division Street on Keeler Avenue but was unaware of where it had come from. A crowd began to gather; at some point, police officers responded to the scene. Duncan remained at the scene "for a while" until an ambulance took Calvin away. She did not speak with police that day but was subsequently contacted and asked to view a lineup. On July 16, 2001, she viewed the lineup at Cook County Jail and identified an individual as "either Cor[ey] or Ricky." She further told detectives that defendant had been the shooter, and Flowers had attempted to fight Calvin. Duncan was shown photographs

of the lineup on the stand and identified Flowers and defendant in the photos. Duncan denied that the police told her who to pick from the lineup.

¶ 37 Duncan admitted that she had been drinking on the day of the shooting. She further admitted to using heroin that month but denied using drugs that day. Duncan acknowledged having been in a methadone program for two years and having previously bought cocaine from Calvin but denied having used any during the month of June. She denied buying drugs from Flowers but knew that the area around the shooting was his "drug corner." Duncan had also been arrested for retail theft two years prior, on two different occasions, and she had been placed on supervision for both.

¶ 38 On cross-examination, Duncan testified that she visited Essie and Helm around 8:30 a.m. and drank two small cups of beer from a 40-ounce bottle. Helm was already drunk, but Essie was not. Duncan briefly returned home to run some errands, and then joined Essie and Helm later on in the afternoon. The three of them did not continue to drink. At some point Essie was in the alley, talking with Calvin. Duncan did not speak with him, but overheard him say that he owed some money, that "they weren't going to do nothing to him because he was out [here]," and that he did not have to worry because he had a gun in the house.

¶ 39 Duncan testified that when Flowers first walked over, defendant was also with him, dressed in a black hooded sweater, but the hood was not up. She watched Flowers talk with Calvin and could not hear what they were saying but understood them to be arguing about money. Flowers then left, and Calvin did not say anything directly to her thereafter. However, she remembered him saying "You and [Essie] out there. I know they're not going to do anything since you all out there." Duncan remembered saying to Calvin, "I don't know[,] people do things to people[,] they don't bother who out there."

¶ 40 Duncan testified that Flowers and defendant returned after about 30 minutes and that she, Calvin, Helm, and Essie were still out in the alley. No one was drinking, but they were waiting for "someone" to return with beer. Duncan clarified that this person was a friend who she had asked to buy beer before Flowers returned, but she did not know his name. This individual was not there when Flowers and defendant returned, but when they did return, Earl Smith was with them. She did not see anyone else come out of a car at that time.

¶ 41 Duncan testified that when the three approached Calvin, Flowers and Calvin started exchanging words while defendant stood there "looking." Smith then hit Calvin on the head. Flowers tried to hit Calvin but missed. After Calvin evaded the punch, he tried to get away. Duncan believed that she saw defendant walk up behind Calvin but was unsure of how close he got to him. When Calvin began running towards Crystal Street, Duncan testified that "nobody followed him" and that he was about two feet out of the alley when he was shot. Following this line of questioning, Duncan remarked "[t]hat's all I'm going to say. *** I can go home. I'm not trying to get nobody hurt. I'm not for that."

¶ 42 Duncan testified that she had been standing about 15 to 20 feet from defendant as Calvin ran and the defendant shot at him. She observed Flowers running down the alley in the other direction towards Division Street, and Smith riding his bike out in the same direction. Helm watched the scene but did not do anything while she and Essie stood there. Duncan believed defendant to be 10 to 12 feet away from Calvin when the gun jammed. She denied being able to describe the color of the car which defendant ran to after the shooting.

¶ 43                                2. Verdict, Sentencing, and Direct Appeal

¶ 44 On May 1, 2003, the jury convicted defendant of two counts of first degree murder. Defense counsel orally moved to set aside the judgment notwithstanding the verdict, which the trial court

denied. On June 10, 2003, defendant filed a motion for a new trial, which the trial court denied that day.[3] The trial court sentenced defendant to 40 years in prison on one count of first degree murder and denied defendant's oral motion to reconsider the sentence.

¶ 45    Defendant timely appealed his conviction. On October 21, 2004, we affirmed defendant's conviction in *Diggs*, No. 1-03-1921. Defendant filed a petition for leave to appeal to our supreme court, which was denied on January 26, 2005. See *People v. Diggs*, 213 Ill. 2d 565 (2005).

¶ 46                    B. Postconviction Proceedings

¶ 47                         1. Petition

¶ 48    On May 15, 2014, defendant filed a *pro se* petition for postconviction relief, alleging actual innocence based on newly discovered evidence. Defendant claimed that, on June 13, 2013, two individuals, Jay Parker and Terrence Miller, contacted him and confessed to the attempted robbery and murder of Calvin, which they had apparently committed along with another individual, Darren "a.k.a. TK" Hawkins. Defendant alleged that, prior to July 2005, he had never met or known Parker, Miller, or Hawkins. According to defendant, Miller had previously written a statement in 2008 to the Cook County State's Attorney's Office, which contained his confession to Calvin's murder. In support of his petition, defendant submitted the affidavits of (a) Miller, dated March 25, 2014, (b) Parker, dated March 28, 2014, and (c) Bryant Duncan, who claimed to be the son of Sylvia Duncan.

¶ 49    Miller's two-page affidavit stated that he was currently incarcerated at Menard Correctional Center. Miller averred that defendant had no involvement in Calvin's murder and that he, Parker, and Hawkins had shot and killed Calvin in June 2001 after the three planned to rob

---

[3]This motion does not appear in the record.

Calvin for drug money. Miller stated that Hawkins drove them in a car to Division Street and Keeler Avenue and that Miller left the car and approached an alley with a black 9-millimeter handgun. Miller averred that he pulled out his gun, he demanded Calvin's money, and Calvin refused and turned to run in the other direction. Miller began shooting him, hitting Calvin multiple times until he was out of bullets. Then Miller returned to the vehicle, and Hawkins drove away. Miller stated that he "fully regret[ed]" his decision, which led him to write a written confession to the state's attorney's office in December 2008, as well as to his own appellate defender that same month, both of which he did not receive any responses to.

¶ 50    Parker's two-page affidavit averred that in June of 2001 between 2:30 or 3 p.m., he, Miller, and Hawkins planned to rob a "well-known drug spot" between Division Street and Keeler Avenue, near Crystal Street. Parker averred that Hawkins drove his car and parked, and Parker then observed an individual that he knew as "Moe," also known as Calvin. Parker stated that Miller pulled out a 9-millimeter gun, asked Moe for money, and Moe refused and tried to run. Miller began to fire his gun at Calvin until he was out of bullets. Parker further stated that he had also written to the state's attorney's office around April 2011.

¶ 51    Finally, Bryant Duncan's affidavit stated that he was the son of Sylvia Duncan. Bryant asserted that—between 2001 and 2004, including June 2001—his mother had been an alcoholic and heroin addict. Bryant averred that in 2001, his mother told him that she and her friend "Ann" had attempted to buy drugs from Calvin and that a man who she had never seen before had approached Calvin and shot him as he tried to run away. Bryant stated that his mother told him that Ann had provided Sylvia's name to the police and that the police had "let her go in return for her cooperation," which resulted in her going to court. Although Bryant claimed he was not aware of the details of his mother's testimony at trial, he averred that she had falsely testified against

defendant. He further averred that he had "personally witnessed" the police and unnamed assistant state's attorneys coerce his mother into naming defendant as the shooter, as well as showing her pictures of the defendant. He further stated that the police and such state's attorneys had used his mother's criminal convictions as an incentive for her to falsely accuse defendant of murdering Calvin, and that her fear of going to jail had been the impetus for her testimony.

¶ 52     On June 22, 2017, the State filed a motion to dismiss defendant's petition, arguing that defendant had failed to allege an actual innocence claim.[4] Defendant filed a response, maintaining that Parker and Miller's affidavits were evidence of such a conclusive nature that would change the outcome of a trial. The postconviction court denied the State's motion.[5] On October 6, 2017, the State filed an answer to the defendant's petition, which generally denied the petition's allegations. On October 17, 2018, the State refiled an answer to the petition, which similarly denied the same allegations, but now stated that defendant had amended his petition to include an additional claim for ineffective assistance of counsel.[6]

¶ 53                                   2. Third-stage Evidentiary Hearing[7]

¶ 54     On January 24, 2019, a third-stage evidentiary hearing commenced on the petition.[8]

---

[4]Defendant's petition was docketed for second-stage proceedings on August 12, 2014, and postconviction counsel from the Cook County Public Defender's Office was appointed to represent defendant.

[5]The record does not reflect an order denying the motion but includes handwritten notes from the postconviction court on September 15, 2017, indicating that Bryant Duncan's affidavit was to be excluded from the record and that the petition was to be advanced to a third-stage hearing.

[6]The amended petition does not appear in the record.

[7]On November 19, 2018, the State filed a supplemental motion to dismiss prior to hearing, which incorporated its previous arguments from its first motion to dismiss. The motion also indicated that defendant tendered an additional affidavit from Flowers to the State on October 29, 2018. The State argued that the new affidavit did not constitute newly discovered evidence and failed to demonstrate that defendant had not been involved in Calvin's murder. The State's supplemental motion was denied on December 4, 2018.

[8]The record reflects that Flowers was called as a witness by defendant, but later asserted his fifth amendment right against self-incrimination. The postconviction court orally stated that although his

¶ 55                                    a. *Terrence Miller*

¶ 56    On direct examination, Miller testified that about an hour before the shooting, he picked up Parker and drove over to the intersection of Division Street and Keeler Avenue. They intended to rob Calvin, a plan that had been set up by "Darren," who he knew through a "mutual associate." Miller was seated in the back of the car, with Parker in the front. Miller and Parker exited the vehicle and approached an alley behind a store, which Miller described as "being part of another alley" that ran east to west. Miller further testified that, at the mouth of the alley, another alley ran north to south and a liquor store on Division Street bordered both.

¶ 57    Miller testified that he and Parker knew where to find Calvin because the alley was a known drug spot. The two moved eastward through the alley and saw Calvin standing near a gate where the two alleys met. Miller called out to Calvin and demanded his money. Calvin tried to run, and Miller shot him. Miller was unsure of how many shots he fired, but he knew they were not in close range because Calvin was running away. He estimated firing six to eight times.

¶ 58    When asked why he had chosen to confess, Miller responded that he was "not the most honorable person in the world" and that he was a "real black party evil dude." He decided to confess while in the process of his own appeal for his current conviction because he had started to change as a person, had "started getting into [his] faith," and had to "wrestle with himself," knowing that someone else was in prison for the shooting. Miller testified that he had written to the state's attorney's office and the Innocence Project in 2008 regarding defendant's innocence, with the Innocence Project interviewing him in prison, and that nothing came of either attempt. He

---

affidavit would be considered part of the record, the amount of weight that it would be given was "minimal," as the contents therein directly contradicted his testimony at the original trial. Former Cook County State's Attorney homicide investigator John Duffy also testified to the details of a videotaped interview he conducted of Jay Parker at Menard on November 21, 2011.

then wrote an affidavit in 2012 or 2013, detailing his involvement in the shooting because of the state's attorney's office's lack of response, as well as his suspicion that the Innocence Project did not believe his story following his interview. Miller reasoned that his affidavit "was the only thing left to do" and the "only way he could help" defendant.

¶ 59    On cross-examination, Miller testified as follows. He had been in the Illinois Department of Corrections since 2007 after he was convicted of two crimes in Du Page County. The first crime was for first degree murder in March 2007, for which he received a 70-year sentence. The second case was for aggravated battery of a police officer or sheriff, for which he received a sentence of seven years.

¶ 60    Miller did not know Calvin personally but knew of him through Hawkins. He denied being friends with Calvin or having any "prior relations or dealings" with him. He did not know how Hawkins or Parker knew Calvin. Miller had not known Parker prior to the shooting and had met him through Hawkins. Miller was also not friends with Hawkins, stating that, "in his world," one did not have to be friends with people "to get money."

¶ 61    Miller believed the shooting occurred on June 13, but he had "never been good with dates." However, he knew that the shooting had occurred in June because it had been near his birthday and that it had taken place between 2 or 3 p.m. on a "regular summer day on the West Side of Chicago." Miller testified that it was Hawkins's idea to rob Calvin and denied having any input into its planning. Miller's role was to make sure that "no one would come up behind them during the robbery." He denied that the shooting was "spur of the moment," but stated that he had relied "completely off" what Hawkins told him.

¶ 62    On the day of the shooting, Hawkins had called him on his cell phone while Miller was on Jackson Boulevard between Kilbourn Avenue and Kolmar Avenue. Hawkins then drove over and

picked him up, and the two went to pick up Parker at Van Buren Street and Karlov Avenue. Hawkins drove and parked behind a liquor store near the intersection of Keeler Avenue and Division Street. Miller described the surrounding areas as residential, with the liquor store's entrance on Division Street. Miller was unaware of the specific address of where they parked, as he was not from the area and it was "not [his] regular hangout."

¶ 63    Hawkins stayed in the car while Miller and Parker left the vehicle and began walking eastward towards the alley. He described their path as "kitty corner," where they had to make a bit of a "slant" to travel into the alley. The two traveled about halfway into the alley, with Parker following him along the way. Miller carried his own personal 9-millimeter handgun with him. Calvin was standing in the area where both alleys connected, and Miller denied that anyone else was in the alley as they approached him. Miller demanded money from Calvin while pointing his gun at his chest and head. Miller described Calvin's reaction as being one of "shock" and "hesitance" before he began to run away, going north towards Crystal Street. Miller denied that he and Parker attempted to strike Calvin but admitted that Parker tried to "grab" at him. When asked if Parker's grab attempt had been included in Miller's affidavit, Miller admitted that it was not and that his affidavit was just an "outline" in which he had not gotten "into every single detail."

¶ 64    Calvin "didn't make it a step" before Miller fired his gun at him. Calvin initially turned around when he began to run, but Calvin's only options were to run to Keeler Avenue or Division Street. Miller saw Calvin fall to the ground in the alley, and then Parker and Miller ran. When asked if he had continued firing the gun as Calvin continued to move away, Miller responded that "when he turned to run, I began to fire" and that he was not watching Calvin's movement. His only thought at the time had been to kill Calvin and that "all [he] cared about was shooting him." Miller did not remain at the scene after the shooting. He believed he fired his gun six to eight times

but was unsure of how many bullets the gun held at the time. He knew it had not been fully loaded because he had used it two days prior but knew it could hold nine bullets. He and Parker ran back to Hawkins's car, and the three left the area. Hawkins dropped both Parker and Miller off where he had picked them up, respectively. A few months later, Miller sold the gun. Miller knew to whom he had sold the gun but refused to identify the individual.

¶ 65                              b. *Jay Parker*[9]

¶ 66    Jay Parker testified that he had known Calvin from around the neighborhood and had attempted to rob him at a drug spot in June 2001 with Miller and a guy he then knew as "TK" or Hawkins. He could not remember the exact time but knew that he was on Crystal Street sometime in the afternoon because it was daylight and the drug spot was between Crystal Street and Keeler Avenue off Division Street. He and Miller got out of a car, approached Calvin in an alley, and exchanged a few words. Calvin attempted to "swing" at him, and Parker tried to grab him back. Calvin took off running, and Miller shot him as he ran towards the street. Parker and Miller then returned to the car and left. Parker denied that defendant had been with them during the robbery or the shooting of Calvin. Parker testified that he had told this information to two assistant state's attorneys who interviewed him in 2011.

¶ 67    On cross-examination, Parker testified as follows. He was currently serving a sentence for murder, for which he was sentenced on April 8, 2010. He was also serving one year for manufacturing and possession of a controlled substance, for which he had been convicted on May 17, 2007.

---

[9]The record reflects that Parker was interviewed by two investigators from the Cook County State's Attorney's Office prior to his testimony. After Parker was advised by his appointed counsel of his fifth amendment right against self-incrimination, the State played various portions of Parker's interview during the hearing for impeachment purposes. The record does not include these videos.

¶ 68    Parker did not remember the exact date of the shooting but knew it had occurred in the first or second of the month of June in 2001. He did not remember the exact address on Crystal Street where they had parked the car but believed it to be the 1200 block. He was familiar with the area where the murder occurred but did not know it well. Parker denied selling drugs in that general area, but knew that Calvin, who he knew as "Moe" at the time, was selling drugs that day. Parker denied buying drugs from Calvin prior to the shooting.

¶ 69    Parker described Hawkins as an "associate" and "friend" that he had known for two years, as Hawkins had a child with one of Parker's family members. He did not know what Hawkins did for a living, and only hung out with him when he was in the area. On the day of the shooting, Hawkins called Parker to assist him with a robbery at Calvin's drug spot. Hawkins and Miller picked Parker up from his house around Van Buren Street and Karlov Avenue in what Parker believed to be a Nissan Altima. Parker had heard of Miller but had not met him prior to the day of the shooting. He further denied ever selling drugs with Miller or defendant. He denied that Miller had driven the car that day and further denied that defendant had been in the car with them. Parker also denied knowing Flowers.

¶ 70    When they arrived near Division Street and Keeler Avenue, Hawkins parked the car off the alley on Keeler Avenue. They had driven up on Division Street because Keeler Avenue was a one-way street. Hawkins had told him that the spot was Calvin's usual area to work, but Parker did not know if Calvin would be there until they drove past and saw him. Miller and Parker exited the vehicle and walked towards the alley behind the liquor store on Keeler Avenue and Division Street. Calvin was standing in the alley, "kitty corner" from the liquor store, but was not near a house or a yard. Parker looked to see if anyone else was around them. Calvin was not facing them as they approached him and was "standing on his side" and looking around. As they moved closer to him,

about halfway into the alley, Calvin turned to look at them. Miller began fidgeting with something in his pocket. Parker was not holding anything.

¶ 71 Parker told Calvin to "just give us all your money" and denied asking for narcotics. Miller continued to fidget with something and then put the items back into his pocket. Parker guessed these items to be "toilet paper or whatever." Calvin appeared to think that the two were "playing with him," so he drew back for a moment, looked around, and then pushed off at Parker. Parker walked up to Calvin and tried to grab him and go into his pockets. Calvin resisted, and Parker tried to grab him again. Parker knew that Miller was somewhere beside him but was unsure if he was on his left or right side as Parker's focus was on Calvin. Parker was unable to grab Calvin, who then took off running towards Keeler Avenue. Parker denied that Miller and Calvin wrestled or struggled with each other in the alley.

¶ 72 Calvin took about "three steps" before Miller started shooting at him. Calvin did not get close to the street, and his back was facing them as he was being shot at. Parker did not know how many shots Miller fired, but he knew that "the slide" on the gun was "back" when the two ran back to the car. Thus, he assumed the gun was empty because "a lot" of shots had been fired. Parker denied knowing that Miller had a gun with him until they exited the vehicle or that the gun had been in his hands as they walked into the alley. When asked if Miller had a gun in one hand and a piece of toilet paper in another, Parker responded that he had "never said that Miller was twirling around with a piece of toilet paper" and that he had only said that he "had a piece of paper." Parker further denied that Miller had been "fidgeting" around, but that when Parker had told Calvin that he was about to be robbed, Miller raised the gun in Calvin's direction. Parker further assumed that Miller still had the gun after Parker attempted to grab Calvin.

¶ 73    After the shooting, Parker and Miller ran back towards Hawkins's car on Keeler Avenue. Hawkins was in the car but Parker did not know if he had gone anywhere in between. Hawkins dropped him off at Van Buren Street and Karlov Avenue, and he did not know what Miller or Hawkins did after that. Parker could not recall what he did after the shooting, but he did not tell anyone about it.

¶ 74                    3. Postconviction Court's Ruling on the Petition

¶ 75    On April 30, 2019, the postconviction court issued an oral ruling on defendant's petition, which vacated defendant's conviction and ordered a new trial.

¶ 76                    4. New Trial Proceedings and the State's Motion *In Limine*

¶ 77    On April 29, 2022, the State filed a motion *in limine* to admit the prior testimony of Essie at defendant's new trial pursuant to Rule 804(b)(1) of the Illinois Rules of Evidence. The State asserted that Essie had died on June 16, 2005, and attached her death certificate in support. The State argued that admission of Essie's testimony was proper, pursuant to Rule 804(b)(1), due to her unavailability and that she had been "thoroughly cross examined and re-crossed" by defense counsel at the original trial. The State further contended that the "motive and focus" of Essie's prior cross-examination was defendant's guilt or innocence, which would be the same as a cross-examination that would occur at a subsequent proceeding.

¶ 78    The State further argued that Essie's testimony was also admissible under section 115-10.4 of the Code of Criminal Procedure (725 ILCS 5/115-10.4 (West 2022)), which governed the admissibility of prior testimony from a now-deceased witness, and thus would not violate defendant's rights under the confrontation clause of the sixth amendment. The State asserted that admissibility of prior testimony should first be assessed as an evidentiary matter, rather than a constitutional concern, but acknowledged that, pursuant to our supreme court's decision in *People*

*v. Torres*, 2012 IL 111302, the two could not so easily be divorced. The State also discussed the relationship between Rule 804 and section 115-10.4. Specifically, the State asserted that when the Illinois Rules of Evidence had been adopted, the committee comments had not identified Rule 804 and section 115-10.4 as within the "very narrow list of potential conflicts between the adopted rules *** and the statutorily created rules of evidence." Thus, the State reasoned, it could be "assumed that compliance with Rule 804 [was] sufficient" under the statute, but "[i]n the event that there [was] any conflict between the two, based on the separation of powers, Rule 804 must prevail over [section] 115-10.4."

¶ 79    Lastly, the State argued that admission under Rule 804(b)(1) was also consistent with long-standing confrontation clause precedent, which solely afforded an opportunity for effective cross-examination. The State maintained that defendant's cross-examination of Essie had been "full, broad, and robust," as the court during defendant's first trial had not limited the scope of cross-examination and defense counsel had been privy to pretrial discovery.

¶ 80    In response, defendant argued that the motion should be denied because he had not had an opportunity to develop Essie's testimony at the first trial as he would have had at retrial and, thus, admission would violate the confrontation clause. Defendant contended that the State's position "ignore[d] the change in circumstances" of the case, specifically with regard to the emergence of Parker and Miller's confessions, citing *People v. Starks*, 2012 IL App (2d) 110273, and *People v. McCambry*, 218 Ill. App. 3d 996 (1991), as persuasive. Defendant pointed out that he never could have confronted Essie with photographs of either individual at trial to see if she had misidentified him, nor could he have explored any potential relationship between Essie and the two men to see if she had perhaps identified defendant in order to help the other two. Finally, defendant pointed out that the State had listed Sylvia Duncan as a witness in the upcoming retrial and that because

she had also witnessed the murder, the State could still procure another witness by reasonable means, which rendered Essie's testimony less probative.

¶ 81 A hearing on the motion was held on May 10, 2002. Following argument, the postconviction court denied the motion and excluded Essie's prior testimony for defendant's upcoming retrial. The court stated, in relevant part:

"THE COURT: Based on Illinois Rule 804 and the confrontation clause and the new evidence that has come to light since Ms. Essi[e]'s original testimony, I do not think that it is in the interest of justice to admit the transcript of her testimony at the first trial and the defendant['s] second trial given the fact that at the time when [the witness] first testified, the information concerning the other two individuals, who have now come forward and taken responsibility, was not available to [defendant]. And I just think the interest[s] of justice require the exclusion of that witness'[s] testimony. So that is my ruling."

¶ 82                                    5. Motion to Reconsider

¶ 83 On June 1, 2022, the State filed a motion to reconsider the court's exclusion of Essie's prior testimony. The State argued, *inter alia*, that Essies' testimony was admissible pursuant to Rule 804(b)(1) because defendant had the benefit of "unlimited cross-examination" and a "fair opportunity" to inquire into Essie's observations, interest, bias, prejudice, and motive at his previous trial.

¶ 84 In response, defendant argued, *inter alia*, that the State's position ignored the requirements of section 115-10.4, which dictated that the testimony of the deceased witness be more probative than any other evidence the State could procure.

¶ 85    On June 8, 2022, the court heard argument and subsequently denied the motion. In its ruling, the court stated, in relevant part, that

"the evidence discovered and introduced into the record at the third stage [postconviction] hearing is of such a definitive character *** and it was not available to defense counsel at the time of the first trial, I think that ILCS 115-10.4 would require the exclusion of Ms. Essie's trial transcript at the second trial."

¶ 86    On June 21, 2022, the State filed a Certificate of Substantial Impairment pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017). That same day, the State timely appealed.

¶ 87                                   II. ANALYSIS

¶ 88                                  A. Jurisdiction

¶ 89    Prior to proceeding to the merits of defendants' arguments, we first consider our jurisdiction. This appeal comes to us from the denial of the State's motion *in limine* prior to defendant's new trial. "The suppression of evidence is an interlocutory, rather than final, order." *People v. Atchison*, 2019 IL App (3d) 180183, ¶ 21. To avoid piecemeal litigation, a notice of appeal generally may not be filed until the trial court has disposed of all claims. *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 341-42 (2001). "Put another way, appellate jurisdiction generally exists only to review final orders." *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 556 (2009). A final order is one that "disposes of the rights of the parties, either upon the entire controversy or upon some definite and separate part thereof." (Internal quotation marks omitted.) *Treece v. Shawnee Community Unit School District No. 84*, 39 Ill. 2d 136, 139 (1968). However, article VI, section 6, of the Illinois Constitution allows for our supreme court to consider appeals beyond final judgments. Ill. Const. 1970, art. VI, § 6. Article VI, section 16, further directs our supreme court to "provide by rule for expeditious and

inexpensive appeals." Ill. Const. 1970, art. VI, § 16. As such, our supreme court has promulgated rules to allow for certain appeals in criminal, postconviction, and juvenile court proceedings.

¶ 90    Relevant here, Rule 604(a)(1) allows the State to appeal in criminal cases from "an order or judgment the substantive effect of which results in *** suppressing evidence." Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017); see also *People v. Young*, 82 Ill. 2d 234, 247-49 (1980) (Rule 604(a)(1) allows State appeals from a pretrial suppression order upon certification that the order substantially impairs its ability to prosecute a case); *People v. Sneed*, 2021 IL App (4th) 210180, ¶ 32. Here, the record reflects that the State timely filed a motion to reconsider the denial of its motion *in limine*, which had the effect of suppressing evidence for the State's retrial of defendant. The State then filed both a certificate of impairment and a notice of appeal within 30 days of the court's ruling on the motion to reconsider.[10] See Ill. S. Ct. R. 606(b) (eff. Mar. 12, 2021) (a notice of appeal must be filed within 30 days of the entry of final judgment appealed from); see also *People v. Marker*, 233 Ill. 2d 158, 172-73 (2009) (timely filed motion to reconsider tolls the 30-day clock for taking an appeal from a suppression order). Therefore, we have jurisdiction to review the issue on appeal.

¶ 91                                B. Standard of Review

¶ 92    It is well-established that it is within the trial court's discretion to decide whether evidence is relevant and admissible. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). Thus, as a general rule, a trial court's ruling on evidentiary matters is reviewed under an abuse of discretion standard.

---

[10]The State also asserts that we have jurisdiction under Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021), which allows for permissive interlocutory appeals based on some specific trial court orders. Rule 604 contains a list of specific orders to be appealed from, but the interlocutory order at issue here is not included in that list. Nevertheless, because we have found that we have jurisdiction under Rule 604(a)(1), we need not consider whether jurisdiction under Rule 606 is proper.

*Starks*, 2012 IL App (2d) 110273, ¶ 20. An abuse of discretion will not be found unless the trial court's decision was arbitrary, fanciful, or unreasonable, where no other reasonable person would take the court's view. *Morgan*, 197 Ill. 2d at 455. However, where a court is found to have applied the wrong legal standard, an abuse of discretion may be found. *Rockford Police Benevolent & Protective Ass'n, Unit No. 6 v. Morrissey*, 398 Ill. App. 3d 145, 154 (2010).[11]

¶ 93                                           C. Arguments

¶ 94     The State argues that the postconviction court abused its discretion by denying its motion *in limine* to allow Essie's testimony at retrial. The State initially contends that the court erred by failing to admit Essie's trial testimony under Rule 804(b)(1) of the rules of evidence. However, embedded towards the end of its brief, the State also contends that the court erroneously found that section 115-10.4 of the Code of Criminal Procedure governed resolution of the State's motion. According to the State, the doctrine of separation of powers dictates that Rule 804(b)(1) controls over section 115-10.4 because the statute conflicts with the rule. Finally, assuming that Rule 804(b)(1) controls, the State further maintains that the court abused its discretion in denying the motion because defense counsel's prior cross-examination satisfied the requirements of the rule.

¶ 95     Defendant responds that the court's ruling was proper under both Rule 804(b)(1) and section 115-10.4. Defendant further posits that even if the court applied the wrong standard to the resolution of the motion, any error was harmless because application of Rule 804(b)(1) would still

---

[11]We observe that at least one court has commented that review of whether a witness was subject to cross-examination by the adverse party, as delineated in section 115-10.4(d), is subject to *de novo* review, rather than abuse of discretion. See *People v. Melchor*, 376 Ill. App. 3d 444, 451 (2007). However, other courts that have addressed section 115-10.4 have analyzed the statute under an abuse of discretion standard. See *People v. Lard*, 2013 IL App (1st) 110836, ¶ 16; *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20.

bar Essie's prior testimony at defendant's new trial and the State is still able to call Sylvia Duncan, an eyewitness to the shooting.

¶ 96    We begin our analysis with an overview of the various overlapping doctrines and concepts underlying the admission of prior testimony of a deceased witness.

¶ 97                            1. The Confrontation Clause

¶ 98    The sixth amendment to the United States Constitution provides that in all criminal prosecutions, "the accused shall enjoy the right *** to be confronted with the witnesses against him," *i.e.*, in this context, via cross-examination. U.S. Const., amend. VI. This section of the sixth amendment is referred to as the confrontation clause and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *People v. Williams*, 238 Ill. 2d 125, 142 (2010). The Illinois Constitution provides similar protections for confrontation, which is coextensive with the federal constitution. Ill. Const. 1970, art. I, § 8; *People v. Tennant*, 65 Ill. 2d 401, 408 (1976). The sixth amendment works in conjunction with the rule against testimonial hearsay, which generally prevents the admission of out-of-court statements offered at trial to prove the truth of the matter asserted. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *People v. Melchor*, 376 Ill. App. 3d 444, 450 (2007); *Williams*, 238 Ill. 2d at 142 (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). As such, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 53, 59.

¶ 99    The issue before us concerns the unavailability of a witness who previously testified at defendant's trial in 2003. As noted by our supreme court, "the requirement of a prior, 'adequate opportunity to cross-examine' the absent witness is at once both an evidentiary and constitutional

requisite for admission of former testimony." (Emphasis omitted.) *Torres*, 2012 IL 111302, ¶ 52.[12] The right to address unavailable witnesses appears to begin with our supreme court's decision in *Barnett v. People*, 54 Ill. 325, 330 (1870), which upheld the admission of testimony from a witness at a preliminary hearing who died prior to trial. Since then, both our supreme court and the United States Supreme Court have held that testimony from a prior proceeding may be admissible at a subsequent trial so long as two requirements are met: (1) the witness from the prior hearing must be unavailable at trial and (2) the defendant must have had an adequate opportunity to cross-examine that witness. See *Crawford*, 541 U.S. at 59; *Torres*, 2012 IL 111302, ¶ 53; see also *Tennant*, 65 Ill. 2d at 411; *People v. Horton*, 65 Ill. 2d 413, 417 (1976).

¶ 100 Whether a defendant had an adequate opportunity to cross-examine a now-unavailable witness has developed over time. See *Torres*, 2012 IL 111302, ¶¶ 47-54. In *Horton*, our supreme court addressed whether cross-examination of an unavailable witness at a preliminary hearing satisfied the demands of the confrontation clause. *Horton*, 65 Ill. 2d 416-17. The court acknowledged that cross-examination during a preliminary proceeding, such as a suppression hearing, may be limited in scope, and thus, "[a]dequate opportunity to cross-examine means an opportunity to *effectively* cross-examine," where "merely providing an opportunity to cross-examine *** is not *per se* adequate opportunity." (Emphasis added.) *Id.* at 417.

¶ 101 In *People v. Rice*, our supreme court expanded upon its prior discussion of what constituted an adequate opportunity to cross-examine. *Rice*, 166 Ill. 2d 35, 40-41 (1995). Again, the court considered the scope and limitations of a suppression hearing and determined that admission of

---

[12]Although both inherently involve considerations that implicate the confrontation clause, we are mindful that our courts are hesitant to reach constitutional issues if the issue on appeal can be resolved on other bases. See *Starks*, 2012 IL App (2d) 110273, ¶ 22.

evidence under the former-testimony hearsay exception also required that the defendant had a "meaningful" opportunity to cross-examine the witness. *Id.* at 41. Specifically, the court stated that "[f]or an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the *motive and focus* of the cross-examination at the time of the initial proceeding must be *the same or similar* to that which guides the cross-examination during the subsequent proceeding." (Emphases added.) *Id.* This holding was further reiterated in *People v. Sutherland*, 223 Ill. 2d 187, 273-74 (2006), which cited *Rice* approvingly.

¶ 102 However, in *Torres*, 2012 111302, ¶ 60, our supreme court stated that "the motive-and-focus test cannot be our *sole* guide" of effective cross-examination. (Emphasis in original.) Rather, the court identified additional factors relevant to the analysis, one being the benefit of " 'unlimited cross-examination' at the prior proceeding," where "[f]airness, and indeed defendant's right to confrontation, demand[ed] an opportunity for adequate cross-examination of the witness" at the first hearing in order for the testimony to be subsequently used at trial. *Id.* ¶ 61.

¶ 103 Additionally, the *Torres* court continued, "[b]eyond the freedom to fully question the witness regarding critical areas of observation and recall, *** bias and prejudice, and to otherwise probe for matters affecting his [or her] credibility," courts also had to consider "what counsel *knows* while conducting the cross-examination." (Emphasis in original.) *Id.* ¶ 62. This, reasoned the court, would in turn "impact counsel's ability *and* opportunity to effectively cross-examine" at the prior hearing. (Emphasis added.) *Id.* This would be especially relevant in circumstances where the cross-examination at the prior proceeding, such as a suppression hearing, would likely be curtailed based on the availability of discovery, versus testimony elicited at a trial, where discovery was presumably complete. *Id.* In light of those considerations, the *Torres* court further stated that courts should also examine whether the unavailable witness's prior testimony was "cumulative of

the testimony of other witnesses," where the question then became whether " 'additional cross-examination would benefit' " the defendant. *Id.* (quoting *Horton*, 65 Ill. 2d at 417).

¶ 104  Finally, the *Torres* court examined the effects of "restrictions—overt and covert" on the adequacy of cross-examination, which considered the nature from which the prior testimony was derived, specifically from the perspective of the trial court's conduct during the proceedings. *Id.* ¶ 64. In doing so, the court highlighted various instances where the trial court in *Torres* appeared to be less than "enthusiastic" in conducting the preliminary hearing, pointing specifically to the court's sustaining of various objections, which in turn appeared to have affected defense counsel's line of questioning on cross-examination. *Id.*

¶ 105  Ultimately, in finding that the trial court erred in admitting prior testimony, the *Torres* court determined that "for the preliminary hearing testimony of an unavailable witness to be subsequently admissible at trial, the trial court must have allowed defense counsel to fully explore the *highly relevant areas* of the witness's opportunity to observe, interest, bias, prejudice, and motive." (Emphasis added.) *Id.* ¶ 66. The court further noted that even if defense counsel had not "at that stage, ha[d] all the information at his or her disposal ***, defense counsel must have had a fair opportunity to effectively inquire into those areas" and without being able to do so, defendant would suffer prejudice that would affect the overall outcome of the trial. *Id.*

¶ 106  In addition to decisional law addressing the confrontation clause and cross-examination, Illinois has promulgated procedural rules and legislative protections, specifically through Rule 804(b)(1) of the Illinois Rules of Evidence and section 115-10.4 of the Code of Criminal Procedure, which were both referenced by the postconviction court in the proceedings below.

¶ 107                                   2. Section 115-10.4

¶ 108   Section 115-10.4, which predates the 2010 codification of the Illinois Rules of Evidence, addresses the admissibility of prior statements where an unavailable witness is deceased. Section 115-10.4 provides:

> "(a) A statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and if the court determines that:
>
> > (1) the statement is offered as evidence of a material fact; and
>
> > (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
>
> > (3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence." 725 ILCS 5/115-10.4(a) (West 2022).

¶ 109   Section 115-10.4 further provides that any prior statement "must have been made by the declarant under oath at a trial, hearing, or other proceeding and been subject to cross-examination by the adverse party." *Id.* § 115-10.4(d). Our courts have summarized the requirements of the admission of a deceased witness's prior testimony as follows: (1) materiality, (2) probative value, (3) trustworthiness of the statement, (4) interests of justice, and (5) prior opportunity for cross-examination.[13] *Melchor*, 376 Ill. App. 3d at 450; see also *Starks*, 2012 IL App (2d) 110273, ¶ 23.

---

[13]Notably, section 115-10.4 was first enacted in 1999, and was amended in 2005 to include the requirement of cross-examination by the adverse party. See Pub. Act 94-53, § 5 (eff. June 17, 2005) (amending 725 ILCS 5/115-10.4).

¶ 110                                    3. Rule 804(b)(1)

¶ 111   Illinois Rule of Evidence 804 (eff. Jan. 1, 2011) also addresses hearsay exceptions when the declarant is unavailable. Rule 804 provides that the declarant may be considered unavailable if, *inter alia*:

> "(4) [the declarant] is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
>
> (5) [the declarant] is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means." Ill. R. Evid. 804(a)(4)-(5) (eff. Jan. 1, 2011).

¶ 112   Relevant here, Rule 804(b)(1) governs the admission of former testimony, which is defined as "[t]estimony given as a witness (A) at another hearing of the same or a different proceeding, *** if the party against whom the testimony is now offered *** had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011).

¶ 113   Rule 101 provides further context for Rule 804(b)(1)'s applicability. Ill. R. Evid. 101 (eff. Jan. 1, 2011). Specifically, Rule 101 states that the rules of evidence "govern proceedings in the courts of Illinois to the extent and with the exceptions stated in Rule 1101." *Id.* Rule 1101 in turn provides that the rules of evidence *do not* apply in certain situations. Ill. R. Evid. 1101(b) (eff. Sept. 17, 2019). Relevant here, Rule 1101(b)(1) states that the rules of evidence do not apply to "[p]reliminary [q]uestions of [f]act," which are "questions of fact preliminary to *admissibility of evidence* when the issue is to be determined by the court under Rule 104." (Emphasis added). *Id.* Then, Rule 104(a) provides the following:

"(a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the *admissibility of evidence* shall be determined by the court, subject to the provisions of subdivision (b) [concerning relevancy]. In making its determination, *the court is not bound by the rules of evidence except those with respect to privileges.*" (Emphases added.) Ill. R. Evid. 104(a) (eff. Jan. 1, 2011).

¶ 114 Significantly, Rule 101 explains the relationship between the rules of evidence and potentially overlapping statutes, providing that "[a] statutory rule of evidence is effective *unless in conflict with a rule or a decision of the Illinois Supreme Court.*" (Emphasis added.) Ill. R. Evid. 101 (eff. Jan. 1, 2011). Committee comments, which were added to Rule 101 on January 6, 2015, further state that "[t]here is no current statutory rule of evidence that is in conflict with a rule contained in the Illinois Rules of Evidence." See Ill. R. Evid. 101, Comment (eff. Jan. 6, 2015).

¶ 115                                    4. Is There a Conflict?

¶ 116 As noted, prior, the State contends that Rule 804(b)(1) should prevail over section 115-10.4 based on the separation of powers doctrine and that the court incorrectly based its evidentiary ruling on the statute. Defendant responds that either version is appropriate, as both result in the same outcome—namely, the barring of Essie's prior testimony. Defendant further points out that the State is "cherry-picking" which standard applies because it actually argued that admission was proper under either standard in its original motion *in limine.*

¶ 117 The record demonstrates that the State raised both Rule 804(b)(1) and the statute as support for the admission of Essie's testimony. Our concern, however, is on which basis the postconviction court denied the motion *in limine*. In its first ruling, the court expressly cited Rule 804 and the confrontation clause as the basis for the motion's denial. The court noted that Parker's and Miller's

confessions were not available to the defendant at the time of the first trial, which, as we discussed above, are considerations relating to the adequacy of the prior cross-examination. However, in both rulings, the court also stated that it did not think it would be in the "interest of justice" to admit Essie's prior testimony. The court repeated this phrase a second time at the end of its first ruling. When ruling on the motion to reconsider, the court stated that it believed "ILCS 115-10.4 would require the exclusion of Ms. Essie's trial transcript at the second trial." Therefore, although the court did not make an explicit ruling as to which provision applied, it appears to have grounded its initial ruling, and subsequent affirmance, in one way or the other, on both Rule 804 and the statute. Thus, and most notably, the court did not state whether there was a conflict between the two and, in turn, did not apply one to the exclusion of the other.

¶ 118   Generally, resolution of whether the two conflict begins with the interpretation of a statutory provision, which is a legal determination subject to *de novo* review. *People v. Peterson*, 2017 IL 120331, ¶ 28. The same is true for the interpretation of our supreme court rules. See *Marker*, 233 Ill. 2d at 164-65. In either case, "our goal is to ascertain and give effect to the drafters' intention," with the most reliable indicator of intent being the language used, which must be given its plain and ordinary meaning. *Id.*

¶ 119   A potential conflict between a rule and statute also involves the separation of powers doctrine. Although our state constitution attempts to separate the powers of the legislative, executive, and judicial branches, such functions may nevertheless overlap. Ill. Const. 1970, art. II, § 1 ("The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another."); *Peterson*, 2017 IL 120331, ¶¶ 29-30. Evidentiary rules are where such overlaps may occur. See *People v. Jackson*, 69 Ill. 2d 252, 257-60 (1977) (collecting cases on examples of conflict between state law and supreme court rules); *People v. Bond*, 405 Ill. App.

3d 499, 506-12 (2010) (analyzing conflict between rule and statute governing impeachment of witnesses with juvenile adjudications). For instance, the judicial article of the Illinois Constitution vests our supreme court with administrative and advisory authority over all courts, which, consequently, extends to rulemaking authority to regulate trials. See Ill. Const. 1970, art. VI, § 6; see also *Peterson*, 2017 IL 120331, ¶ 29. Notwithstanding this, the General Assembly may also "legislate in this area without necessarily offending separation of powers." *Peterson*, 2017 IL 120331, ¶ 30. Thus, where there may be potential conflict between a rule governing matters within the purview of our judiciary and a legislative enactment expressing public policy determinations, our courts have attempted to reconcile the two harmoniously. See *People v. Walker*, 119 Ill. 2d 465, 475-76 (1988).

¶ 120    Ultimately, however, our supreme court "retains primary constitutional authority over court procedure." *Peterson*, 2017 IL 120331, ¶ 31. Accordingly, where an *irreconcilable* conflict exists between the two, it is well-established that the supreme court rule shall prevail. See *Walker*, 119 Ill. 2d at 475; see also Ill. R. Evid. 101 (eff. Jan. 1, 2011) ("[S]tatutory rule of evidence is effective unless *in conflict* with a rule or a decision of the Illinois Supreme Court." (Emphasis added.)); see also *People v. Deroo*, 2022 IL 126120, ¶¶ 18-28 (finding a conflict between Illinois Rule of Evidence 803(6) (eff. Apr. 26, 2012) and a portion of the Illinois Vehicle Code (625 ILCS 5/11-501.4 (West 2016)); *Peterson*, 2017 IL 120331, ¶¶ 27-34 (holding that section 115-10.6 of the Code of Criminal Procedure conflicts with Rule 804(b)(5) (Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011))); *Strukoff v. Strukoff*, 76 Ill. 2d 53, 61 (1979) (finding no irreconcilable conflict between provision of state divorce law and state constitution); *Jackson*, 69 Ill. 2d at 260 (finding conflict between state statute and supreme court rule regarding jury selection).

¶ 121    As noted, prior, the postconviction court did not identify any conflict between the rule and the statute. Indeed, the trial court's initial ruling was partially based on its application of Rule 804, and its ruling on the motion to reconsider does not indicate that the court retreated from its previous reliance on the rule. Thus, the court implicitly found no such conflict, which, as we construe it, means that it found that, under either standard, Essie's prior testimony should not be admitted at defendant's retrial.

¶ 122    We are inclined to agree with the postconviction court's implicit finding of no conflict, given that both the statute and the rule require that the unavailable witness's prior testimony had to have been subject to questioning, particularly through cross-examination.[14] See Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011); 725 ILCS 5/115-10.4(d) (West 2022); see also Ill. R. Evid. 101, Comment (eff. Jan. 6, 2015) (no current conflict between a rule of evidence and statute); see, *e.g.*, *Peterson*, 2017 IL 120331, ¶¶ 31-34 (noting that irreconcilable conflict between rule and statute may be found where one imposes an additional reliability requirement); *People v. Brown*, 374 Ill. App. 3d 726, 734 (2007) (equating requirements of section 115-10.4 with those underlying the right to cross-examination); *Starks*, 2012 IL App (2d) 110273, ¶ 27 (same); *People v. Smith*, 333 Ill. App. 3d 622, 633 (2002) (rejecting claim that section 115-10.4 is incompatible with cross-examination standards). We note that, in both its brief and rebuttal during oral argument, the State points out that section 115-10.4 contains additional qualifiers for admission beyond adequate cross-examination, such as whether "the interests of justice will best be served by admission of the statement." 725 ILCS 5/115-10.4(a)(3) (West 2022). However, we need not address these

---

[14]There has been at least one court that has addressed both provisions together, but it was not asked to make a determination as to whether one controlled over the other. See *Starks*, 2012 IL App (2d) 110273, ¶¶ 22-28 (holding that trial court did not abuse its discretion by barring testimony under both Rule 804(b)(1) and statutory provision).

distinctions, as the dispositive issue on appeal is whether, under either the statute or rule, Essie's prior cross-examination was adequate. Of course, even if there was a conflict between the two, we would agree with the State that Rule 804 would control, based on our separation of powers progeny. Nevertheless, this agreement would still not affect our ultimate determination that Essie's testimony should be excluded. As we discuss below, we believe that the court correctly determined that defendant was unable to conduct a prior adequate cross-examination of Essie, in light of the newly emerged evidence during his postconviction proceedings.

¶ 123                    5. The Adequacy of Essie's Prior Cross-Examination

¶ 124   Here, there is no dispute that Essie's death rendered her unavailable for defendant's new trial or that Essie was subject to cross-examination at defendant's first trial. Thus, the dispositive issue is whether such cross-examination was *effective*. The State argues that defendant had an opportunity and a similar motive to develop Essie's testimony at his first trial. Defendant responds that the prior cross-examination of Essie was not meaningful, effective, or ample, given the newly discovered confessions of two formerly unknown witnesses.

¶ 125   As noted, our supreme court in *Torres* identified four main considerations assessing effective cross-examination: (1) whether the prior cross-examination had the same or similar motivation as a subsequent examination, (2) whether defense counsel had an unlimited opportunity to cross-examine, (3) whether defense counsel knew all relevant information to conduct an effective cross-examination, and (4) whether there were any restrictions, overt or covert, on the examination. We recognize that *Torres* was limited to the issue of whether the motive and focus test had been properly applied in the admission of prior testimony. *Torres* was also decided after both section 115-10.4 and Rule 804 were enacted and does not expressly involve either provision.

We are also mindful that *Torres* involved prior testimony derived from a preliminary hearing, whereas, here, defendant was convicted after a three-day jury trial.

¶ 126   Nevertheless, *Torres*'s framework is helpful in determining whether Essie's prior cross-examination was adequate and meaningful. See *Rice*, 166 Ill. 2d at 39 ("[D]etermining whether ample opportunity to cross-examine at the prior hearing exists does not lend itself to a *per se* determination, [and] must be decided on the circumstances of each case."). On this point, we also reiterate that our review is abuse of discretion, the most deferential standard of review, where if we were to disagree with the postconviction court's decision, we would have to determine that the court's ruling was " 'clearly against logic' " or " 'exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted' " to warrant reversal. *Pierce v. Cherukuri*, 2022 IL App (1st) 210339, ¶ 19.

¶ 127         *a. Whether Defense Counsel had an Unlimited Opportunity to Cross-Examine*

¶ 128   The State argues that defense counsel "enjoyed an unlimited opportunity" to develop Essie's testimony at the first trial, as defense counsel had the benefit of discovery and had virtually unlimited ability to question Essie on both cross and recross examination. The defendant does not appear to respond to this argument.

¶ 129   We first observe that defense counsel cross-examined Essie at a full trial, rather than a preliminary hearing, almost two years after Calvin's murder. Thus, absent any indication otherwise, we agree with the State that defense counsel likely had the benefit of full discovery prior to trial. Additionally, he was able to cross-examine Essie much more broadly on all relevant topics, as opposed to what may have been allowed at a more limited proceeding, such as a suppression hearing. See *Horton*, 65 Ill. 2d at 416-17 (observing that a preliminary hearing is "ordinarily a much less searching exploration into the merits of a case than a trial,' " as its function

is to determine the existence of probable cause); *Rice*, 166 Ill. 2d at 40 (same). But see also *People v. Lard*, 2013 IL App (1st) 110836, ¶ 18 (observing that preliminary hearings generally address probability of criminal activity, rather than proof beyond reasonable doubt); *People v. Boston*, 2018 IL App (1st) 140369, ¶ 57 (questioning of witness at preliminary hearing and trial focus on the same issue—namely, whether the evidence supports a finding that defendant committed the charged crime).

¶ 130   Ultimately, we find that this consideration favors admission of the testimony. The record reflects that on direct examination, Essie was questioned about her prior drug use, whether she had been under the influence on the day of the shooting, who was present at the time of the incident, where the shooting took place, and her interactions with the police and later identifications of defendant as the shooter. Defense counsel was able to follow up on such questioning during cross-examination and to conduct a recross examination. As such, on this point, defense counsel had a sufficient opportunity to test the witness's credibility, powers of observation, and recall based on the knowledge he had at the time. However, we are mindful that, even where the opportunity to cross-examine was broad, defense counsel obviously was not able to cross-examine Essie specifically about Parker and Miller, who simply were not even part of the timeline laid out by her testimony.[15] See *People v. Starks*, 2012 IL App (2d) 110273, ¶¶ 29-31; see also *People v. Weinke*, 2016 IL App (1st) 141196, ¶ 60 (noting that the right to cross-examination only guarantees an opportunity for effective cross-examination; the cross-examination's inadequacy may not be due to defense counsel's ineffectiveness but "rather by circumstances outside his control")

___

[15]We note that, even in Flowers's original testimony at trial, he testified that there had been "no one else in the area" at the time he and defendant allegedly approached and shot Calvin. Essie's testimony was also contradictory where, in one instance, she stated that defendant had not been with Flowers when they returned after going to Flowers's home and then, in another instance, that he had in fact been at the scene.

¶ 131    b. *Whether There Were Any Restrictions on Essie's Cross-Examination*

¶ 132   Next, the State argues that there were no overt or covert restrictions at the first trial that impeded prior defense counsel's cross-examination of Essie. Specifically, the State points out that there is no evidence demonstrating any "atmosphere where defense counsel would not feel free to develop Essie's testimony," noting that there were only two sustained substantive objections made by the State during Essie's cross-examination. Defendant also does not appear to respond to this argument.

¶ 133   This consideration works in tandem with the previous *Torres* consideration but, in particular, focuses on the trial court's role and possible effect on the cross-examination. See *Torres*, 2012 IL 111302, ¶ 64 (observing that trial court's demeanor prior to and during hearing affected the adequacy of prior cross-examination); see also *Starks*, 2012 IL App (2d) 110273, ¶ 28 (trial court's incorrect barring of testimony under rape shield statute contributed to inadequate cross-examination at prior proceeding). We again agree with the State that there was no evidence of any covert or overt restrictions that otherwise would have had an effect on defense counsel's cross-examination. The record shows that the trial court consistently allowed relatively broad questioning by defense counsel where, from our view, defense counsel even sometimes questioned Essie beyond the scope of direct examination. The two sustained objections were also relatively inconsequential, as they concerned whether Essie had observed a police presence at the liquor store she went to on the day of the shooting and whether she generally "knew" what occurred in the neighborhood. Further, the only possible indication of a more dismissive attitude displayed by the court occurred in the posttrial phases when defendant was sentenced. However, those concerns were already resolved on defendant's direct appeal. See *Diggs*, No. 1-03-1921. Thus, we find that this factor also falls in favor of admission of Essie's testimony.

¶ 134          c. *What Defense Counsel Knew at the Time of Cross-Examination*

¶ 135   The issue in this appeal turns significantly on the analysis of the last two *Torres* considerations—namely, what defense counsel knew at the time of Essie's cross-examination— which in turn implicates whether the prior and subsequent cross-examination could be seen as similarly motivated. As to the former, although the State concedes that defense counsel was not aware of Miller and Parker's identities at the time of the first trial, it maintains that prior defense counsel knew "all relevant information necessary for a full and effective cross-examination" of Essie. Interestingly, the State even argues that the emergence of two known suspects is actually *irrelevant* as to whether defense counsel had a "fair opportunity" to inquire into Essie's observations, interests, biases, prejudices, motives, and, ultimately, the reliability of her identification. Finally, the State insists that defendant was able to cross-examine Essie about her potential misidentification and her relationships to other witnesses at the scene. In support of its contentions, the State proffers *Boston*, 2018 IL App (1st) 140369, as factually similar and persuasive.

¶ 136   Defendant responds that defense counsel was unaware of the identity of the two men who later confessed to the shooting, which significantly affected what counsel was able to cross-examine Essie on at trial. Defendant asserts that *Starks*, 2012 IL App (2d) 110273, and *McCambry*, 218 Ill. App. 3d 996, are persuasive, noting that those two cases concern the emergence of newly discovered evidence and known alternate suspects, which did not occur in *Boston.*

¶ 137   On this *Torres* consideration, the case law appears to suggest that analysis concerning what defendant might not have known at the time of the original cross-examination is also linked to what effect that knowledge might have had in the first proceeding. Put another way, courts have sometimes examined the adequacy of prior cross-examination, based on whether the new

knowledge would have had an effect on the ultimate outcome of the prior proceeding. See *Torres*, 2012 IL 111302, ¶ 63 (trial court's admission of testimony from prior preliminary hearing and sole eyewitness improper where defense counsel had been unaware of witness's inconsistent statements or citizenship status at time of initial cross-examination); *Rice*, 166 Ill. 2d at 40-41 (State did not have meaningful opportunity to cross-examine codefendant witness, where it could not question witness on the nature of his relationship with defendant, which might have prompted codefendant to falsely testify); *Boston*, 2018 IL App (1st) 140369, ¶¶ 61-65 (rejecting argument that undisclosed evidence and incomplete discovery at time of prior cross-examination would have had an impact on cross-examination and ultimate outcome at trial); *Lard*, 2013 IL App (1st) 110836, ¶¶ 24-25 (rejecting argument from convicted defendant robber that preliminary hearing testimony should not be admitted where discovery later showed a prior break-in at same property, and defendant could not show how having this information would help benefit defense counsel's prior cross-examination); *Starks*, 2012 IL App (2d) 110273, ¶¶ 28-29 (admission of prior witness testimony at new trial improper where, among others, State had provided incorrect test results at first rape trial, and later-developed DNA testing excluded defendant as possible suspect).

¶ 138    We first consider those cases cited to us by defendant, the first of which is *McCambry*, which involved an unavailable witness's identification of the defendant at a lineup procedure following a robbery. *McCambry*, 218 Ill. App. 3d at 997, 1000-01. The witness testified at a preliminary hearing but did not specifically testify as to his identification of the defendant at a lineup at the police station. *Id.* at 998-99. After the victim was unable to be located, over the defendant's objection, the victim's testimony was entered into the record. *Id.* The State then called a police officer to testify as to the lineup procedures. *Id.* at 999. On cross-examination, the officer

identified a photograph of the lineup, which showed two out of the four men wearing baseball caps. *Id.* at 1000.

¶ 139   On appeal, we determined that admission of the victim's preliminary hearing testimony violated the defendant's confrontation clause rights because, although defense counsel had been able to cross-examine the officer about the lineup, counsel had been unaware prior to trial that only two of the four men in the lineup had worn baseball hats. *Id.* at 1001. This was because, in part, at the time of trial, our supreme court rules had not allowed for discovery prior to a preliminary hearing. *Id.* We further noted that the defense counsel's cross-examination of the officer at trial had been limited by the scope of direct examination and that he had little time to prepare for questioning on that specific topic. *Id.* We reasoned that defense counsel's inability to cross-examine the unavailable witness about his lineup identification of the defendant was "significant" and affected the trial court's ability to assess the identification's reliability. *Id.*

¶ 140   In *Starks*, 2012 IL App (2d) 110273, ¶¶ 1, 3, also cited by defendant, the trial court granted the defendant's motion *in limine* to bar the admission of the prior testimony of a now-deceased complainant. At the defendant's first trial, the complainant testified that she had been sexually assaulted by the defendant. *Id.* ¶ 5. The State presented a forensic serologist, who testified to the presence of semen on the complainant's underwear and vagina. *Id.* ¶ 6. Additionally, prior to the beginning of the trial, the court also granted the State's motion *in limine* to bar defendant from introducing evidence of the complainant's prior sexual activity. *Id.* ¶ 4. A jury ultimately found the defendant guilty of aggravated criminal sexual assault, attempted aggravated criminal sexual assault, aggravated battery, and unlawful restraint. *Id.* ¶ 13.

¶ 141   The defendant filed a postconviction petition, which was dismissed by the trial court. *Id.* ¶ 15. The defendant appealed the dismissal, and we determined that defendant was entitled to a

new trial. *Id.* Specifically, we stated that a new trial was warranted based on, in part, new DNA tests that excluded him as a source of the semen that was obtained from the complainant's clothing and vagina. *Id.* We further found that the first trial's serology test results were contrary to the trial testimony of the serologist, which also now excluded the defendant as the source of the semen. *Id.* We also found that the trial court incorrectly barred any testimony regarding the complainant's prior sexual contacts based on an improper application of the rape shield statute. *Id.*

¶ 142   Prior to the new trial, the complainant died and the defendant filed a motion *in limine* to bar her previous trial testimony pursuant to the confrontation clause. *Id.* ¶ 16. The court granted the motion, basing its ruling on the confrontation clause, section 115-10.4, and Rule 804(b)(1). *Id.* ¶ 17. On appeal, the State argued that the trial court's granting of the motion was in error because the defendant had the opportunity at his first trial to cross-examine her on everything except her prior sexual contacts, which were of little relevance and thus unlikely to result in prejudice to the defendant. *Id.* ¶¶ 1, 21. We rejected the State's argument, finding that the defendant did not have an adequate opportunity to cross-examine the complainant. *Id.* ¶ 28. In pertinent part, we found that the State's arguments "ignore[d] the facts that came to light after [the] defendant was convicted," where there were now previously unavailable DNA tests that excluded defendant as the source of semen, as well as the presentation of serology results that were now known to be incorrect and also exclusionary of the defendant as a source. *Id.* ¶ 29. We reasoned that because this evidence had not been available to the defendant at the time complainant first testified, no adequate cross-examination of the complainant could have occurred. *Id.*

¶ 143   Finally, in *Boston*, 2018 IL App (1st) 140369, ¶¶ 1, 53-68, cited by the State, our court considered, among other issues, whether the admission of preliminary hearing testimony of a "key" eyewitness violated both the confrontation clause and Rule 804. There, the defendant was charged

with first degree murder in the stabbing of Steven Moore. *Id.* ¶ 1. During a preliminary hearing, the State called the victim's mother, who testified that the defendant was a friend of her grandson. *Id.* ¶ 5. The mother testified that she had been in a different room in the home, heard some noise, and found the defendant on top of the victim. *Id.* ¶¶ 6-7. She testified that the defendant had been stabbing the victim and continued to do so, despite her best efforts to stop him. *Id.* On cross-examination, the mother testified that she was unaware if either her son or the defendant had consumed alcohol that night, and although her son had previously used drugs in the past, she did not believe he used them anymore. *Id.* ¶ 8.

¶ 144 The victim's mother died prior to trial, and the defendant filed a motion *in limine* to bar her testimony, which the trial court denied. *Id.* ¶ 10. At trial, while on direct and cross-examination, defendant testified that he had killed the victim in self-defense. *Id.* ¶¶ 30-42. The State also introduced evidence that the victim's blood had tested positive for cocaine and morphine. *Id.* ¶ 23. Additionally, the State presented the testimony of a medical examiner who performed the victim's autopsy, who testified that the victim had died of a single stab to the chest and that all other injuries had been " 'superficial' " and " 'slashing wounds.' " *Id.* ¶¶ 22, 63. A jury ultimately found defendant guilty of first degree murder. *Id.* ¶ 48.

¶ 145 On appeal, the defendant argued that admission of the mother's testimony was improper because he had been unable to engage in a meaningful cross-examination of the victim's mother. *Id.* ¶ 53. Defendant suggested that, had he been able to cross-examine the mother at trial, he could have further bolstered his self-defense theory by questioning her about the toxicology report that challenged her assertion that her son had not been under the influence at the time of his death. *Id.* ¶¶ 59, 62. Defendant also pointed out that the medical examiner's report, which had also been unavailable at the time of the victim's cross-examination, potentially challenged the mother's

recounting of the stabbing. *Id.* ¶ 63. Finally, the defendant argued that *Starks* was persuasive. *Id.* ¶ 64.

¶ 146    The *Boston* court rejected defendant's contentions and upheld the admission of the victim's mother's testimony at trial. *Id.* ¶ 68. With regard to the toxicology report, the court observed that defendant had been able to cross-examine the victim's mother about her son's drug use. *Id.* ¶ 62. Next, the court noted that defendant had been able to cross-examine other witnesses who had attended the autopsy to challenge the testimony of the medical examiner and the examiner's ultimate findings. *Id.* ¶ 63. Lastly, we distinguished *Starks*, pointing out that, there, defendant had been provided with *inaccurate* test results at trial, and the existence of other exculpatory testing had not yet emerged for the defense counsel to utilize in order to help counsel " 'expos[e] facts' " that would have helped to undermine other witness credibility. *Id.* ¶ 65.

¶ 147    As noted, the State finds solace in *Boston*, while the defendant urges us to consider *Starks* and *McCambry* as persuasive. Preliminarily, we can distinguish *McCambry* on the basis that, there, our court was concerned with the defendant's lack of access to pretrial discovery, whereas, here, we have already determined that defendant had the benefit of discovery prior to Essie's cross-examination.

¶ 148    Thus, the facts of our case fall somewhere between *Starks* and *Boston.* It is true that, as the State posits, our case does not involve the emergence of new technology, which undermined the reliability of the first trial's forensic evidence and, thus, had the potential to exonerate the *Starks* defendant. It is also true that defense counsel, as in *Boston*, was able to question and cross-examine other witnesses such as Sylvia Duncan, whose testimony had the potential of undermining the reliability of Essie's recollection of the shooting, thus giving defense counsel opportunities to place reasonable doubt into the State's theory of the case.

¶ 149   However, here, we believe *Starks* is more applicable. We acknowledge that the two new confessions, which had been unavailable prior to 2014, are not necessarily scientific matters. However, the new technology in *Starks* only had the *potential* to exonerate the defendant there, which did not equivocate the conclusion that he had *not* assaulted the victim, especially where the *Starks* complainant did not testify about her prior sexual contacts at the first trial. Here, as in *Starks*, the emergence of two confessions also do not equate to defendant's innocence at his retrial but have the potential to remove his involvement in the crime. We further note that, in *Starks*, there were no other *known* individuals that could be identified as a potential alternate suspect. In contrast here, there are two individuals who confessed to the shooting under oath. Had these confessions or individuals been known at the first trial, defense counsel could have certainly developed an entire new theory of the case beyond reasonable doubt, which could have impacted the factfinder's decision. See *Lard*, 2013 IL App (1st) 110836, ¶¶ 24-25 (rejecting claim of inadequate cross-examination where defendant did not "show how additional cross-examination with information gleaned from subsequent discovery would benefit him."); see also *Torres*, 2012 IL 111302, ¶ 62.

¶ 150   Accordingly, we believe that the lack of knowledge that defense counsel had about the existence of two potential and known suspects, who ultimately have taken responsibility for the shooting under oath, significantly affected how counsel would have conducted his prior cross-examination of Essie, as well as other witnesses at the first trial. As such, this factor favors the barring of Essie's testimony.

¶ 151        d. *Whether Prior Cross-Examination of Essie was Similar or Similarly Motivated*

¶ 152   Finally, we assess whether defense counsel's prior cross-examination was similarly motivated to the one that could occur at defendant's retrial. The State argues that admission of Essie's testimony at defendant's new trial would serve "precisely the same purpose" as it did

during the first trial. The State posits that the motive behind Essie's cross-examination at the first trial was to test Essie's credibility, powers of observation, and recall, which was demonstrated at defense counsel's closing argument, where he attacked Essie's credibility based on her drug use, her prior relationship with the victim and Flowers, and the possibility that someone else might have shot Calvin. The State also maintains that Parker and Miller's testimony does not change this conclusion because Rule 804(b)(1) only requires that the motives of cross-examination be similar, not identical. As such, the State continues, any testimony derived from the new witnesses would be cumulative of topics already covered during Essie's prior cross-examination, such as a possible misidentification of the shooter or whether Essie may have been manipulated into testifying falsely.

¶ 153    Defendant responds that the State's position minimizes the significance of the newly discovered evidence and ignores how Miller and Parker's confessions could have affected Essie's cross-examination at trial. Specifically, defendant points out that he was unable to question Essie on her recollection of the murder based on Miller and Parker's version of the shooting, whether she had a relationship with either individual, and if there were potentially nefarious reasons for why Essie identified defendant as the shooter. Finally, defendant further rejects the State's suggestion that prior defense counsel advanced a cognizable misidentification or third-party shooter theory at the first trial. Even assuming he did, defendant reasons that there is no comparison between cross-examining Essie about an "amorphous, unidentified third party" and questioning her specifically about two people who confessed to the murder.

¶ 154    Case law prior to *Torres* appears to be relatively consistent on the proposition that, where a full trial is held and a new one is to begin, ultimately the motive and focus of both concern the guilt or innocence of the defendant. See, *e.g.*, *People v. Hawkins*, 326 Ill. App. 3d 992, 1003

(2001); see also *People v. Taylor*, 287 Ill. App. 3d 800, 809 (1997) (motive and focus of testimony of an unavailable third party, who confessed to crime in a posttrial motion following trial and conviction, would be the same as what would have been derived at retrial). But defendant does not challenge this proposition. Instead, defendant hones in on what he was not able to question Essie on, in particular, the sequence of events leading up to, during, and after the shooting, which are now in question, as well as whether Essie may have had any relationship with either Parker or Miller that may have resulted in misleading or even false testimony.

¶ 155    As we noted previously, the record demonstrates a substantive cross-examination of Essie at defendant's first trial on all points of relevant witness evaluation, such as bias, prejudice, and recall, all of which were meant to test the credibility of one of the State's primary eyewitnesses in a case where no physical evidence was actually ever traced back to the defendant. However, we find the defendant's contention persuasive that prior defense counsel's attempts to test Essie's credibility were geared towards placing reasonable doubt in the minds of the jury, versus the line of questioning he may have pursued if the evidence that has emerged today had been available for defense counsel in 2003. See *Taylor*, 287 Ill. App. 3d at 805, 810 (trial court erred in denying admission of an unavailable witness who confessed to the crime where defense counsel would have been able to tailor overall trial strategy to place blame on specific individual at new trial).

¶ 156    We acknowledge that, if Essie were to be cross-examined again, certainly some parts of the questioning regarding her recall of the shooting would be similar. Indeed, defense counsel would have likely still asked Essie questions related to her alcohol and drug use prior to and on the day of the shooting, why she did not immediately speak to the police after the shooting, and if her identification of defendant during a lineup viewing may have been tainted by possible police interference. However, it cannot be denied that the emergence of evidence concerning two known

and alternate suspects would have opened an entirely new line of questioning. Further, although not entirely relevant to this factor, it is not unreasonable to conclude that this evidence would also have affected the questioning of other witnesses who testified for the State at the first trial, such as Sylvia Duncan, whose testimony appears relatively cumulative to that of Essie's during the first trial. See *Torres*, 2012 IL 111302, ¶¶ 62-63.

¶ 157    Accordingly, we find that the circumstances here concern more than just a generalized conclusion that defendant's guilt or innocence would be the motive and focus of cross-examination at trial. Even if similar testimony would have been partly derived from Essie at retrial, a significant portion of her testimony would now be tested in a way that simply could not have happened the first time around. See *Starks*, 2012 IL App (2d) 110273, ¶ 32 (because defendant could not cross-examine witness on new evidence, the witness's credibility could not be tested on such issues, which in turn could affect all charges against defendant). As such, we also find that this factor favors the barring of Essie's prior testimony.

¶ 158                6. The Prior Cross-Examination was Inadequate

¶ 159    Accordingly, after considering all the relevant circumstances outlined in *Torres*, we find, on balance and taking into account the principles underlying the right to confrontation and cross-examination, that we cannot say that the postconviction court's denial of the motion was arbitrary or unreasonable. Because Rule 804(b)(1) requires the prior testimony to have been developed by similar opportunity or motive on cross-examination, we do not find that the postconviction court erred in its barring Essie's testimony on that basis.

¶ 160    Moreover, even accepting that the court's ruling was, in part, also based on section 115-10.4, denial of the motion is nevertheless warranted. As pointed out by the defendant, the State does not make any argument on appeal as to whether Essie's testimony could also be admitted

under the statute and, thus, would otherwise be considered forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited); see also *Lard*, 2013 IL App (1st) 110836, ¶ 15 (where defendant challenged admission of prior testimony under section 115-10.4 but only proffered argument concerning the prior opportunity for cross-examination, defendant forfeited any argument as to the remaining statutory factors). However, because the postconviction court appeared to ground some of its ruling in the statute, we note merely in passing that even applying the statute in this case, we would still be unable to find an unreasonable exercise of judicial discretion. Although it is true that Essie's testimony went to a material fact within the case, we have already found that her cross-examination was insufficient under Rule 804(b)(1). Further, Essie's testimony is cumulative to that of Duncan's, who is anticipated to testify at defendant's new trial. See *Torres*, 2012 IL 111302, ¶ 63 (reversing admission of testimony where unavailable witness's testimony was not cumulative of others and was the only evidence placing defendant at scene of the crime). Accordingly, we do not find that the postconviction court abused its discretion in its denial of the State's motion *in limine* also on this basis and affirm the court's judgment.

¶ 161                                   III. CONCLUSION

¶ 162   For the reasons stated, we affirm the postconviction court's denial of the State's motion *in limine* to admit the prior testimony of a now-deceased witness.

¶ 163   Affirmed.

*People v. Diggs*, 2023 IL App (1st) 220955

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2001-CR-17936-02; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Matthew Connors, and Zachary M. Slavens, Assistant State's Attorneys, of counsel), for the People. |
| **Attorneys for Appellee:** | Torreya L. Hamilton and Kathleen A. Hennessy, of Hamilton Law Office, LLC, of Chicago, for appellee. |